[No. 51690–1.   En Banc.   July 14, 1988.]

THE STATE OF WASHINGTON, *Respondent,* v. CHRISTOPHER
ST. PIERRE, *Appellant.*

*Bertha B. Fitzer,* for appellant.

*Norm Maleng, Prosecuting Attorney for King County,* and *Deborah J. Phillips, Special Deputy,* for respondent.

UTTER, J.—Christopher St. Pierre seeks reversal of his convictions for first degree felony murder of Damon Wells and aggravated first degree murder of John Achord. The central issue in both convictions is whether the trial court denied St. Pierre's right of confrontation under the sixth amendment to the United States Constitution by admitting the out-of-court statements made by codefendants, Andrew Webb and the defendant's brother, Paul. Finding the defendant's Sixth Amendment rights to have been violated in one case but not the other, we affirm the conviction for the first degree felony murder of Damon Wells but reverse the conviction for the aggravated first degree murder of John Achord.

Damon Wells and John Achord were murdered in early 1984. Paul and Christopher St. Pierre and Andrew Webb, a friend living at the house and who was present on both occasions, later confessed to some involvement in the events surrounding both killings, although their accounts of Achord's death vary in significant details. Of the three defendants, only Christopher testified during trial.

The events leading to the murder of Damon Wells began at the St. Pierre house the night of February 24, 1984, where Wells was attending a party. Andrew Webb and the St. Pierre brothers severely beat Wells following a fight in

which a friend of Wells apparently got the better of Andrew Webb. Paul then suggested that they take Wells out somewhere and "teach him a lesson." Paul, Christopher, and Webb put Wells in Paul's car and began driving around. During their ride, Christopher punched Wells repeatedly.

At Webb's suggestion, they drove to Salmon Beach to leave Wells there. Once they got to the beach, Paul pushed Wells down and took his shoes. Wells defiantly told Paul that he would get back at him. Paul responded by telling Webb that they were going to have to "waste" Wells. Wells immediately got up and began running away and yelled for help. The three other men chased him, caught him, and tackled him to the ground. Christopher kicked him in the head, rendering him unconscious. Paul handed a knife to Webb who then cut Wells' throat several times. Paul and Christopher also stabbed Wells, who died as a result of his wounds. Upon returning to St. Pierre's house, the three men washed their clothes and took showers. Christopher burned his bloodied boots in the fireplace.

The three men returned to Salmon Beach the next day, picked up Wells' body and placed it in a sleeping bag. They drove to a camping area near Elbe, where they buried the body and covered the grave with grass.

Three months later, John Achord was murdered at the St. Pierre house. Achord had met Paul and Webb after a concert and joined them at St. Pierre's house later that evening. At a time when neither Christopher nor Webb was in the house, Paul shot Achord in the head. Christopher and Webb returned to the house and found Achord lying face down in a pool of blood. Paul claimed to have fired the shot in self–defense.

At this point the accounts of the three men differ somewhat.

Statement of Andrew Webb: Webb suggested that if Paul shot Achord in self–defense they should simply call the police and report the fact. Christopher responded that it would not be a good idea to have the police come to the house since Paul was high on acid and the police would not

believe his story. Christopher also expressed concern that the police might find out about the Damon Wells murder. He suggested that they bury Achord's body. Webb stated that he tried to persuade the St. Pierres not to bury Achord because he was still alive and making a horrible breathing sound. Webb suggested that they had time to save him if they called an ambulance. At that point, Paul pulled out his knife and repeatedly stabbed Achord.

Statement and Testimony of Christopher St. Pierre: Although Christopher's account is consistent with Webb's as to most details, it diverged in three significant respects. First, he denied that Achord was alive when he entered the room. Second, he denied that he was present when the stabbing took place. Finally, he denied there was any discussion of whether to call the police.

Statement of Paul St. Pierre: Paul admitted that he shot Achord when the two men were alone in the living room of St. Pierre's house. Paul did not say whether Achord was dead by the time Christopher and Webb returned or whether there had been any discussion about calling the police. Nor did Paul say anything about stabbing Achord.

Regarding subsequent details, all three statements are fairly consistent. Paul and Christopher cut the living room carpet around the body and dragged it outside to Webb's car. They drove to Wells' grave near Elbe and buried Achord in the same area.

Worried that the bullet lodged in Achord's head could be traced back to Paul's gun, Paul and Christopher drove back to the gravesite a few days later. They severed Achord's head with an axe and placed it in a bucket of cement. After the concrete set, Christopher and a friend threw it in the Puyallup River where it was discovered months later.

Shortly thereafter, Paul and Andrew Webb got into a fight during which Webb was shot. During the police investigation of this shooting, other residents of the St. Pierre house told detectives of possible killings. With this information, the police obtained a search warrant and began searching the St. Pierre house. The same day, June 19,

1984, Christopher decided to confess and led the police to the gravesites, the weapons and the disposal site of the head. Christopher signed a written statement and gave it to the police. Christopher and Paul St. Pierre and Andrew Webb were arraigned for charges stemming from both murders. Paul gave a statement to police on June 29. Webb gave his statement on July 17 in the context of a plea bargain arrangement under which the State agreed not to pursue the death penalty for the Wells murder and to drop all charges against him pertaining to the Achord murder. Each of these statements appears to have been properly obtained.

Initially, Webb and the St. Pierre brothers were charged with the aggravated murder, kidnapping and assault of Damon Wells (counts 1 through 3). Only Paul was charged with the death of John Achord (count 4); Christopher and Webb were charged with rendering criminal assistance for helping dispose of the body (count 5). Trial on the Wells homicide began in September 1984 in Pacific County where the case had been moved due to extensive pretrial publicity in Pierce County. A mistrial was declared shortly thereafter when the prosecutor conceded that several jurors had been improperly excused.

On October 9, Webb pleaded guilty to the first degree felony murder of Damon Wells in fulfillment of the earlier plea bargain. The State then dropped all charges against Webb pertaining to the Achord murder. Under the terms of the agreement Webb was obliged to testify against the St. Pierre brothers.

Upon completion of an autopsy on Achord's head, which concluded that the bullet wound may not have been fatal, the State filed an amended information charging Christopher St. Pierre with the Achord murder. The State's theory of this part of the case, based upon the autopsy report and Webb's statement, was that Christopher encouraged Paul to stab Achord to death in order to conceal the earlier death of Damon Wells. The State also filed notice of intent to seek the death penalty on this count.

After several delays due to Paul's decision to fire his attorney, questions regarding Paul's competency, and Webb's illness and eventual decision not to testify, selection of the second jury to hear the Wells murder trial began on April 8, 1985. Neither defendant testified at the Wells trial, and Webb refused to testify even after being ordered to do so. All three out–of–court statements referred to above were admitted into evidence. The court instructed the jury, however, to consider the statements by the St. Pierre brothers only against the brother who made the statement. The jury found Paul guilty of aggravated first degree murder but declined to impose the death penalty. The jury also found Christopher guilty of first degree felony murder, first degree kidnapping and second degree assault. The court imposed concurrent sentences for these offenses.

The Achord murder trial followed. Again, the jury heard all three out–of–court statements and again Paul and Webb refused to testify. However, Christopher testified and stated that he did not know that Achord had been stabbed and denied that there had been any discussion in his presence about whether to call the police. He said that he simply panicked upon learning that his brother had shot Achord and that was why he helped his brother dispose of the body.

The jury found both defendants guilty of aggravated first degree murder. Following the penalty phase of the trial, the trial court sentenced Paul and Christopher to life in prison without possibility of parole.[1]

## I

The central issue presented by these cases is whether Christopher St. Pierre's right to confront the witnesses against him was violated when the out–of–court statements made by codefendants Paul St. Pierre and Andrew Webb were admitted into evidence and neither was available for cross examination. St. Pierre argues that these out–of–court

---

[1] Paul St. Pierre killed himself in prison shortly after the defendants' notices of appeal were filed.

statements are inadmissible hearsay and that the trial court committed reversible error by allowing them to be admitted. The State responds that both out–of–court statements have sufficient indicia of reliability to be admissible under recognized exceptions to the hearsay rule and that therefore St. Pierre's right of confrontation was not infringed. The State argues further that if St. Pierre's Sixth Amendment right of confrontation was violated in these cases it was harmless error.

The right to confront one's witnesses is a fundamental right in our criminal justice system. This right, embodied in the sixth amendment to the United States Constitution, is an attempt to ensure that a person accused of a crime is not convicted on the basis of mere allegations and unsworn testimony. As the Supreme Court stated in a landmark ruling nearly a century ago, the primary purpose of the confrontation clause is to allow for the cross examination of the witness

> in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

*Mattox v. United States,* 156 U.S. 237, 242, 39 L. Ed. 409, 15 S. Ct. 337 (1895). The right established in the Sixth Amendment is applicable to the states through the due process clause of the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065 (1965).[2]

The scope of the confrontation clause in cases involving the admission of statements by codefendants has received considerable attention in recent years from the United States Supreme Court. In *Bruton v. United States,* 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968), the Court

---

[2]Washington's constitution is more explicit, providing a criminal defendant the right to meet the witnesses against him "face to face." Const. art. 1, § 22 (amend. 10). *See State v. Parris,* 98 Wn.2d 140, 654 P.2d 77 (1982).

declared that a criminal defendant is denied his Sixth Amendment right of confrontation when a nontestifying codefendant's pretrial confession is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant. The risk is too great, said the Court, that the jury will not follow the instructions, with devastating consequences to the defendant.

■ The Court has expressed particular concern about the use of codefendant statements in criminal trials where the statements are not made under oath and the witness has not been subjected to cross examination. In *Douglas v. Alabama,* 380 U.S. 415, 13 L. Ed. 2d 934, 85 S. Ct. 1074 (1965), the Court declared hearsay statements of an accomplice's confession to be inherently suspect. As the Court stated in *Lee v. Illinois,* 476 U.S. 530, 541, 90 L. Ed. 2d 514, 106 S. Ct. 2056 (1986), the

> truthfinding function of the Confrontation Clause is uniquely threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross–examination.

Such statements are presumptively unreliable and cannot be admitted unless they bear "sufficient 'indicia of reliability' to rebut the presumption . . ." *Lee,* at 543 (quoting *Ohio v. Roberts,* 448 U.S. 56, 66, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980)).

In *Parker v. Randolph,* 442 U.S. 62, 60 L. Ed. 2d 713, 99 S. Ct. 2132 (1979), the Court considered, but did not authoritatively resolve, the question of whether *Bruton* is applicable where the defendant's own confession, corroborating that of his codefendant, is admitted against him. In that case, each of the jointly tried defendants had himself confessed, his own confession was introduced against him, and his confession was substantially similar to those of his nontestifying codefendants.

However, in a recent opinion authored by Justice Scalia, the Court extended *Bruton* to exclude a codefendant's confession that corroborates the defendant's admissible confession. *Cruz v. New York,* 481 U.S. 186, 95 L. Ed. 2d 162,

109 S. Ct. 1714 (1987). The *Parker* plurality would have held *Bruton* inapplicable to cases involving "interlocking confessions", but *Cruz* squarely rejected this interpretation. Citing *Lee,* the Court held that

> where a nontestifying codefendant's confession incriminating the defendant is not directly admissible against the defendant . . . the Confrontation Clause bars its admission at their joint trial . . . even if the defendant's own confession is admitted against him.

*Cruz v. New York,* 95 L. Ed. 2d at 172.[3]

In an important qualification to this rule of exclusion, the Court stated that the defendant's own confession may be considered at trial to determine whether his codefendant's statements are supported by sufficient "indicia of reliability" to be directly admissible against him despite the lack of opportunity for cross examination, and may also be considered on appeal in assessing whether any confrontation clause violation was harmless.[4]

Thus, the key issue under the Sixth Amendment is whether the statements of Paul St. Pierre and Andrew Webb have sufficient indicia of reliability to be directly admissible against Christopher St. Pierre. We have stated previously that out–of–court statements from a nontestifying codefendant made against penal interests and which inculpate the defendant are admissible against the defendant only when they bear adequate indicia of reliability. *State v. Anderson,* 107 Wn.2d 745, 750, 733 P.2d 517 (1987); *see also State v. Dictado,* 102 Wn.2d 277, 287–88, 687 P.2d 172 (1984). The necessary indicia of reliability

---

[3]In *Richardson v. Marsh,* 481 U.S. 200, 95 L. Ed. 2d 176, 107 S. Ct. 1702 (1987), decided the same day as *Cruz,* the Court declined to extend *Bruton* to cases involving a codefendant's confession that had been redacted to omit any reference to the defendant. In such instances, the statements would not be excluded on Sixth Amendment grounds. However, none of the three confessions in this case was redacted for the purpose of trial.

[4]Neither *Lee v. Illinois, supra,* nor *Cruz v. New York, supra,* had been decided at the time the trials in these cases were conducted.

may be established by showing that the out–of–court statement meets one of the firmly rooted exceptions to the hearsay rule or that there are sufficient "particularized guarantees of trustworthiness" to make the hearsay admissible. *Anderson,* at 753; *State v. Parris,* 98 Wn.2d 140, 148, 654 P.2d 77 (1982).

To determine if the presumption of unreliability is overcome, we must examine the circumstances surrounding the statement and its maker as well as the content. *State v. Ryan,* 103 Wn.2d 165, 174, 691 P.2d 197 (1984). It is clear from *Cruz* that the defendant's own confession can also be considered in determining reliability. *Cruz,* 95 L. Ed. 2d at 172.

Thus, to the extent that the defendant's confession "interlocks" with the accomplice's statement, there will be some showing of reliability. 95 L. Ed. 2d at 171. To the extent that the statements diverge, however, the defendant's statement does not provide the necessary indicia of reliability. *Lee,* at 545. As the Supreme Court stated in *Lee:*

> If those portions of the codefendant's purportedly "interlocking" statement which bear to any significant degree on the defendant's participation in the crime are not thoroughly substantiated by the defendant's own confession, the admission of the statement poses too serious a threat to the accuracy of the verdict to be countenanced by the Sixth Amendment.

*Lee v. Illinois, supra* at 545.

Applying these standards to the present case, we conclude that the statements of Paul St. Pierre and Andrew Webb pertaining to the murder of Damon Wells have sufficient "indicia of reliability" to be directly admissible in the trial against Christopher St. Pierre for that crime. All three statements indicate that each of the men were involved in the events leading up to the murder at Salmon Beach. Each of them admitted that they beat Wells in the St. Pierre house; they mutually decided to take the victim to the other side of town; they rode together in Paul's car to Salmon Beach; when Wells tried to run away, they all

chased him, caught him and knocked him to the ground; and Webb cut Wells' throat several times. Because Christopher's own confession is sufficient to establish his participation in this crime and his liability for felony murder, the admission into evidence of the two other statements by Paul and Webb does not pose a Sixth Amendment problem.

We reach the same conclusion regarding that portion of Paul St. Pierre's statement describing the murder of John Achord. Paul's statement is limited and states only that Christopher and Webb were around the house that night, left at one point and returned to find Achord on the floor with a gunshot wound to the head. These bare facts about Christopher's presence in the house that evening are confirmed by Christopher's own statement. There is nothing in Paul's statement about the Achord murder that implicates Christopher in the murder itself. According to Paul, Christopher was involved in the events surrounding this grisly crime only to the extent of helping dispose of the body. Since Christopher's own confession said as much, his Sixth Amendment right of confrontation was not violated when Paul's confession was admitted against him.

The portion of Andrew Webb's statement pertaining to the Achord murder presents a more serious problem. As noted above, the State had originally charged Christopher and Webb with rendering criminal assistance for their participation in disposing of Achord's body, a charge for which there would appear to be ample evidence. After the State obtained Andrew Webb's statement and the results of an autopsy became available, the rendering charge against Christopher was dropped; instead, he was charged with aggravated first degree murder. Many of the same details surrounding this murder are found in the out–of–court statements made by Christopher and Webb. However, the two accounts differ markedly on the critical details for which liability for murder could attach.

The State's theory of the case was that Christopher prompted Paul to stab Achord to death, making Christopher an accomplice to aggravated murder. *See* RCW 9A.08-.020(3). To prove this theory, the State had to show that Christopher knew that Achord had not been fatally injured by the initial gunshot fired by Paul, and that he in some way encouraged Paul to kill Achord either to conceal the shooting itself or to prevent police discovery of the Wells murder. The medical evidence produced at trial suggested that the gunshot was not immediately fatal. Also, Paul's subsequent statement to the psychiatrist supports Webb's claim that Achord was making noises after he was shot.

However, Paul did not say who handed him the knife with which he stabbed Achord, nor did he say that Christopher was still in the room at this time. Neither Paul nor Christopher corroborated Webb's description of a conversation about whether they should call the police. In his testimony, Christopher flatly denied that any such conversation took place. Thus, the only evidence from which a jury could conclude that Christopher aided or abetted an aggravated murder came from the unsworn out–of–court statement of Andrew Webb.

These confessions diverge significantly on the critical details of the murder. Because Webb's statement lacks the necessary indicia of reliability, we cannot countenance its admission in the case against Christopher St. Pierre. Nor do we find the necessary indicia of reliability in the circumstances surrounding Webb's statement or from other admissible evidence. The autopsy report, for example, suggests only that the initial gunshot to the head was not immediately fatal and that the stabbings were the direct cause of death. It provides no evidence of Christopher's complicity in the murder. The ruling of the Supreme Court in *Lee v. Illinois, supra,* compels us to conclude that the admission of Webb's uncorroborated statements denied Christopher St. Pierre his Sixth Amendment right of confrontation.

## II

The State seeks to avoid this conclusion by arguing that Webb's statement can properly be considered under one of two hearsay exceptions: as a declaration against penal interests or as a statement of a coconspirator. The trial court found Webb's statement admissible as a declaration against interest.

Although out–of–court statements that are firmly rooted in exceptions to the hearsay rule may be sufficient to overcome a Sixth Amendment challenge, evidentiary rules do not circumscribe the limits of the confrontation clause. *California v. Green,* 399 U.S. 149, 155–56, 26 L. Ed. 2d 489, 90 S. Ct. 1930 (1970); *Anderson,* at 749. Thus, it is possible that an out–of–court statement admissible under one of the hearsay exceptions will not satisfy the requirements of the Sixth Amendment. It is unnecessary to resolve this issue here, however, since we find neither hearsay exception to be applicable.

The State contends that Webb's statement is admissible insofar as it constituted a declaration against interests. ER 804(b)(3) provides an exception to the rule against hearsay for those statements that are contrary to the declarant's penal interests. Three basic requirements must be met before such statements can be admitted. First, the declarant must be unavailable. Second, the declarant's statement must so far tend to subject him to criminal liability that a reasonable person would not have made the statement unless he believed it to be true. Third, the statement must be accompanied by corroborating circumstances that indicate its trustworthiness. *State v. Ng,* 104 Wn.2d 763, 772, 713 P.2d 63 (1985).

Applying these requirements to that portion of Webb's statement pertaining to the Achord murder, we conclude that it does not qualify as a declaration against interest. Contrary to the State's argument that Webb was exposing himself to great criminal liability when he gave his statement to police, the facts of this case suggest just the opposite. Rather than exposing himself to greater criminal

liability, Webb was seeking to diminish that liability by showing that he alone tried to help Achord and that he later wanted nothing to do with the gruesome disposal of Achord's head. While Webb did confess to the murder of Damon Wells, he also sought to absolve himself of any responsibility for the death of John Achord.

Furthermore, the circumstances surrounding the statement do not lend great confidence in its trustworthiness. Webb was the last of the three defendants to give a statement to police. When he did so, it was pursuant to a plea bargain arrangement the result of which was that Webb was not charged with any crime pertaining to the murder of John Achord or its attempted cover–up. A confession made by a person in custody and in the context of a plea bargain is inherently untrustworthy; even though part of the statement on its face is against the declarant's interest, the statement may actually have been made to gain advantage. *State v. Parris,* 98 Wn.2d 140, 151, 654 P.2d 77 (1982). We are not convinced that Webb's statement regarding the circumstances surrounding Achord's murder was contrary to his penal interests.

The State also contends that the portion of Webb's statement regarding Achord's murder was properly admitted as that of a coconspirator. ER 801(d)(2)(v) provides that a statement of a coconspirator made "during the course and in furtherance of the conspiracy" is not hearsay. *State v. Dictado,* 102 Wn.2d 277, 687 P.2d 172 (1984). Coconspirator statements are generally considered sufficiently reliable to withstand confrontation clause scrutiny even without corroboration. *Bourjaily v. United States,* 483 U.S. 171, 97 L. Ed. 2d 144, 107 S. Ct. 2775 (1987); *United States v. Inadi,* 475 U.S. 387, 89 L. Ed. 2d 390, 106 S. Ct. 1121 (1986).

Prior to admitting coconspirator statements, the trial court must first determine whether the State has shown, with substantial independent evidence, a prima facie case of conspiracy. *State v. Dictado, supra.* The trial court must also find that the statements were made during

the course and in furtherance of the conspiracy. Statements made after the conspiracy has ended or following the arrest of one of the alleged coconspirators are not within this exemption. *Dictado,* at 283 (citing *State v. Goodwin,* 29 Wn.2d 276, 186 P.2d 935 (1947)).

The trial court did not rule on this issue. The ruling of the trial court admitting the statement may, however, be affirmed by this court using ER 801(d)(2)(v) as an alternative theory. *Thomas v. French,* 99 Wn.2d 95, 104, 659 P.2d 1097 (1983). We decline to do so. Independent of Webb's statement, there is no evidence to support a finding that Andrew Webb and Christopher St. Pierre were involved in a conspiracy to murder John Achord; in fact, Webb declares that he had nothing to do with Achord's death and the prosecution apparently believed him. Webb's statement regarding this murder was not that of a coconspirator.

■ Finally, the State argues that even if Webb's statement violated Christopher St. Pierre's Sixth Amendment right of confrontation, the error was harmless since the untainted evidence was sufficient to establish Christopher's guilt for the aggravated murder of John Achord. An error of constitutional magnitude in a criminal prosecution is harmless if the reviewing court is convinced beyond a reasonable doubt that the evidence not tainted by the error is, by itself, so overwhelming that it necessarily leads to a finding of guilt. *State v. Guloy,* 104 Wn.2d 412, 425, 705 P.2d 1182 (1985), *cert. denied,* 475 U.S. 1020 (1986). Constitutional error is presumed to be prejudicial and the state bears the burden of proving that the error was harmless. *State v. Stephens,* 93 Wn.2d 186, 190–91, 607 P.2d 304 (1980).

The State has not met this burden. Webb's unsworn statement was the only evidence directly linking Christopher St. Pierre to Achord's murder and was crucial to the State's case. Without the statement, it is most unlikely that the State would have brought this charge at all as is evident by the State's initial charge of rendering criminal assistance. Denying St. Pierre the fundamental right to confront Andrew Webb, the State's chief witness against him, denied

him the opportunity to conduct a cross examination that
could have raised serious questions about Webb's ability to
perceive events correctly that night, his questionable repu-
tation for truthfulness, and the incentives he may have had
to lie. These matters go the heart of the State's case against
Christopher St. Pierre for Achord's death. The State has
not shown beyond a reasonable doubt that Christopher
would have been convicted of aggravated murder without
Webb's statement.

## III

Admitting the statements from Paul St. Pierre and
Andrew Webb did not deny Christopher St. Pierre his
Sixth Amendment right of confrontation in the Wells mur-
der trial, since Christopher St. Pierre's own statements
established his guilt for this crime. Therefore, his convic-
tion for the first degree felony murder of Damon Wells is
affirmed.

Andrew Webb's statement pertaining to Christopher's
alleged involvement in the slaying of John Achord did not
have sufficient indicia of reliability, however, and its
admission in that case improperly denied Christopher St.
Pierre his Sixth Amendment right of confrontation. The
conviction for aggravated murder is reversed.[5]

PEARSON, C.J., and BRACHTENBACH, DOLLIVER, DORE,
ANDERSEN, CALLOW, and GOODLOE, JJ., concur.

DURHAM, J., concurs in the result.

Reconsideration denied November 4, 1988.

---

[5]Appellant raises numerous other issues on appeal which we have considered
and find to be without merit. These include violation of defendant's right to a
speedy trial; various alleged incidents of prosecutorial misconduct; the prejudicial
effect of a spectator's brief, one–time outburst during trial; being forced to wear
manacles during the trial; the prosecutor's amendment of the information after
trial had begun; and insufficiency of the evidence.